CONCORD ELECTRIC CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 4355. Promulgated August 8, 1927.

1. Under the circumstances herein, certain payments made by petitioner *held* to constitute ordinary and necessary business expenses.

2. Where interest upon payments is payable upon a certain date, contingent upon a contract not being terminated before that date, it is not a proper deduction from gross income over the years when payments were made upon the contract, but becomes a liability when the obligation to pay interest is fixed.

*W. P. Wormhoudt, Esq.,* for the petitioner.
*Joseph K. Moyer, Esq.,* for the respondent.

This proceeding is for the redetermination of deficiencies in income and profits taxes for the years 1918, 1919, 1920, and 1921, in the amounts of $178.37, $423.22, $152.57, and $271.43, respectively. The deficiency letter states that there are overassessments for the fiscal year ended June 30, 1917, and the six-month period ended December 31, 1917, and the petition alleges that the taxes for that year and part of year are also in controversy.

### FINDINGS OF FACT.

The petitioner is a New Hampshire corporation with its principal office at Concord, N. H. It is and was during the years 1916 to 1921, inclusive, engaged as a public utility, supplying electricity to the City of Concord. Its electric current is and was generated at its hydroelectric plant and auxiliary steam station at Sewall's Falls, and transmitted to a substation at Concord, a distance of about five miles. The Manchester Traction Light & Power Co., hereinafter called the Manchester Company, is and was during the years mentioned, also a public utility operating in Manchester, N. H. It owns and owned in the years 1916 to 1921, inclusive, several hydroelectric plants, including a plant known as Garvin's Falls Station, in Bow, N. H., adjoining Concord on the south.

Prior to July 27, 1916, the petitioner and the Manchester Company had at various times surplus electric current which they furnished to each other. The ability of each company to furnish electric current to the other was subject to the increasing requirements of the regular business of both companies and this fact made it necessary that each company should have the right to terminate any contract entered into with the other company whenever the demands of its business should render such action necessary or advisable. Under these circumstances

the petitioner and the Manchester Company on July 27, 1916, entered into the following written contract:

THIS AGREEMENT, by and between the MANCHESTER TRACTION, LIGHT AND POWER COMPANY, a corporation duly established by law and having its principal place of business in the City of Manchester, County of Hillsborough, State of New Hampshire, party of the first part, hereinafter referred to as the MANCHESTER COMPANY, and the CONCORD COMPANY, a corporation duly established by law and having its principal place of business in the City of Concord, County of Merrimack, State of New Hampshire, party of the second part, hereinafter referred to as the CONCORD COMPANY,

WITNESSETH: that whereas both parties hereto are engaged in the generation and distribution of electric energy and whereas each party has at time surplus power which it desires to sell to the other party,

Now, THEREFORE, said parties hereto, each for itself, its successors and assigns, covenant and agree together as follows:—

The term of this contract shall be for three (3) years from January 1, 1917, and thereafter until the same shall be terminated by one year's written notice by either party to the other. Such notice may be given by either party at the expiration of the second year so that the entire term shall be three years from the date of execution.

Each party hereto agrees, at such times as it has surplus water generated electric energy which it desires to sell to the other party upon the terms set forth in this contract, and said party desires to purchase said energy on said terms, to sell such surplus water generated electric energy to said other party at the rate of one-half cent ($0.005) per kilowatt hour.

Whenever the MANCHESTER COMPANY has not sufficient surplus water generated electric energy to supply the needs of the CONCORD COMPANY, it agrees to sell steam generated electric energy to the CONCORD COMPANY, if the CONCORD COMPANY so requests, at the rate of one and three-eighths cents (1⅜¢) per kilowatt hour, if and when the MANCHESTER COMPANY shall be producing at any or all of its steam plants steam generated electric energy for its own customers. However, if said CONCORD COMPANY shall request steam generated electric energy when the MANCHESTER COMPANY shall not be producing at its steam plants steam generated electric energy for its own customers, then the price to be paid by the CONCORD COMPANY shall be the cost of producing such electric energy, plus ten (10) per cent, but not in any case to be less than one and three eighths (1⅜¢) cents per kilowatt hour.

The CONCORD COMPANY agrees to purchase of the MANCHESTER COMPANY all the steam generated electric energy which it may require so long as the MANCHESTER COMPANY is able to furnish the same, provided, however, that the CONCORD COMPANY may at its option use its own steam equipment if the MANCHESTER COMPANY is not at the time operating its steam plants for its own customers. The MANCHESTER COMPANY agrees, that, during the term of this contract it will furnish all the steam generated electric energy required by the CONCORD COMPANY not exceeding 2000 K. W. in capacity measured at its Garvin's Falls power station.

Each party hereto agrees to pay to the other party on or before the 6th day of each month in arrears for the preceding month for such electric energy as it may have purchased under this agreement from the other party during the said preceding month.

The frequency voltage and character of the electric energy furnished under this agreement by either party shall be three (3) phase and approximately

thirty-five thousand (35,000) volts, sixty (60) cycle, at the Garvin Falls Power House.

The CONCORD COMPANY agrees, at its own expense, to modify the present transmission line switching and protective devices, etc., at its station in Concord and also at the MANCHESTER COMPANY's station at Garvins Falls, so that they shall be suitable for the voltage at the Garvins Falls bus bars, and so that the plants of the two companies shall at all times operate properly in parallel and that it will so maintain the same during the term of this agreement. The switching, protective devices and other apparatus installed at the MANCHESTER COMPANY's Garvin's Falls Station by the CONCORD COMPANY, shall be of General Electric Company's make, uniform in material and arrangement with that now being installed, and shall be subject to the approval of the MANCHESTER COMPANY. The MANCHESTER COMPANY shall operate and care for said apparatus in the same manner as its own similar apparatus in said sub-station, without expense to the CONCORD COMPANY. The MANCHESTER COMPANY shall supply all labor, superintendence and materials required for repairing, replacing or renewing said apparatus or any part thereof, and the CONCORD COMPANY shall pay the bills therefor promptly upon presentation. The CONCORD COMPANY shall have access to said sub-station by its representatives at all reasonable times for the purpose of inspecting its apparatus therein, but shall not interfere with the operation thereof.

The MANCHESTER COMPANY agrees to extend the present substation building at its southerly and a distance of about fourteen (14) feet to accommodate the current and potential transformers and switching devices to be installed by the CONCORD COMPANY, the cost of said extension to be paid by the CONCORD COMPANY in four (4) equal annual payments as follows:

 ¼ on January 1, 1917.
 ¼ on January 1, 1918.
 ¼ on January 1, 1919.
 ¼ on January 1, 1920.

The interest on the above payments at the rate of seven per cent, (7%) per annum on January 1, 1921.

Provided, however, that if the contract is terminated by the MANCHESTER COMPANY before the above payments have been made, then no further payments shall be required of the CONCORD COMPANY on account of the cost of said extension beyond the date of the expiration of said contract.

It is mutually agreed that the CONCORD COMPANY shall acquire no ownership in the extension of said building on account of the above payments. If the contract is terminated by the CONCORD COMPANY at the expiration of three (3) years, or any time thereafter, before the full payment covering the cost of the extension of the building and interest thereon at seven (7) per cent has been made, then the balance due with interest shall become due and payable to the MANCHESTER COMPANY.

All electric energy bought or sold under this contract shall be measured as it enters or leaves the bus bars of the MANCHESTER COMPANY in said Garvin's Falls power house and such instruments as may be required for this purpose shall be furnished by the MANCHESTER COMPANY, except that all high tension current and potential transformers shall be furnished by the CONCORD COMPANY. All meters and indicating instruments located at the Garvin's Falls Station and belonging to the CONCORD COMPANY may be used in the new installation so far as possible. The indication of these instruments shall be used as a basis in computing monthly payments.

Either party furnishing water generated electric energy to the other under this agreement shall have the right to interrupt the supply without notice, but shall endeavor to give notice to the other party whenever possible.

Neither party shall be liable to the other party for any loss or damage occasioned such other party by or in connection with the interchange of electric energy under this contract, or caused by or to the apparatus installed therefor or occasioned in any way by the use of the same. The MANCHESTER COMPANY shall not be liable in damages for failure to furnish steam generated electric energy to the CONCORD COMPANY under the terms of this contract, if it shall diligently employ all the available steam capacity, owned or controlled by it, for such purpose, after supplying by steam power the demands of its other customers which it is unable to supply from its available water power plants.

Each party hereto to indemnify and save harmless the other party from any loss or damage arising from any liability of the latter for injury to the person or property of third parties by reason of the maintenance or use of the wires, circuits, fixtures, or other apparatus owned by the former, or by or on account of the electric current flowing therein; meaning that each party shall be ultimately responsible for the liability to third parties for the damages occasioned by the maintenance and use of its own property, whether its own electric current is being used thereon or not; provided, however, that for the purposes of this paragraph the wires, fixtures, and other apparatus owned by the CONCORD COMPANY inside of the Garvins Falls substation of the MANCHESTER COMPANY shall be regarded as owned by the MANCHESTER COMPANY so long as the same are operated and cared for by it, so that the MANCHESTER COMPANY shall be responsible for any liability to third parties occasioned by the maintenance and use thereof.

The MANCHESTER COMPANY hereby grants to the CONCORD COMPANY during the life of this agreement permission to erect and maintain in such locations on the land of the MANCHESTER COMPANY as are mutually agreed upon, the poles and fixtures of the CONCORD COMPANY, constituting a part of the transmission line required by said agreement, and to remove any growth and trim any trees which may interfere with said line or the operation thereof, upon the following conditions:

The said poles and fixtures, together with the manner of their erection and maintenance, shall at all times be satisfactory to the MANCHESTER COMPANY, and shall not in any way interfere with its lines, machinery or other apparatus.

In case the MANCHESTER COMPANY shall desire that the location of any part of said transmission line over its land be moved to some other suitable location on its land on account of the sale of land, the development or improvement of the property or other reasonable cause, the CONCORD COMPANY agrees, at its own expense, to move the said line as the MANCHESTER COMPANY may require.

On the expiration or other termination of this contract the CONCORD COMPANY shall have the right to remove its poles, fixtures, and other apparatus used in connection with said line, including the apparatus owned by it in the Garvins Falls substation, but in so doing shall cause no unnecessary inconvenience to the operation of the plant, or damage to the land, buildings, or other property of the MANCHESTER COMPANY.

Agreement dated May 13, 1911, between the parties hereto for the purchase and sale of surplus power is hereby abrogated.

The Manchester Company expended the amount of $7,526.18 for the extension of its substation at Garvin's Falls in order to accommodate the current and potential transformers and switching devices to be installed by the petitioner as provided in the contract of July 27, 1916, and pursuant to that contract one-fourth of the amount so expended, namely, $1,881.54 was billed to and paid by the petitioner each year. The petitioner also paid $188.16 for the services of engineers employed for the purpose of facilitating the construction work. These payments were made by the petitioner as follows:

| | |
|---|---:|
| During the six-month period ending December 31, 1917__ | $2, 069. 70 [1] |
| During the year 1918_____ | 1, 881. 54 |
| During the year 1919_____ | 1, 881. 54 |
| During the year 1920_____ | 1, 881. 54 |
| Total payments_____ | 7, 714. 34 |

During the year 1921 the petitioner also made the final payment provided by the contract of July 27, 1916, as "the interest on the above payments at the rate of 7 per cent per annum on January 1, 1921," amounting to $1,317.08. The amounts above set forth were, when paid by it, charged to expense on its books of account and were deducted from gross income on its income and profits-tax return as business expenses for the years in which they were paid. The petitioner's books were kept on the accrual basis.

Upon audit of the petitioner's return for the years mentioned the respondent disallowed as deductions from gross income the amounts paid by it to the Manchester Company on account of the extension of the substation at Garvins Falls, on the ground that they were capital expenditures and should be capitalized, and he also disallowed as a deduction from gross income for the year 1921, the interest payment of $1,317.08 on the ground that the interest accrued during the years in which the indebtedness existed, and that it should be allocated and taken as deductions in those years.

OPINION.

MARQUETTE: The petitioner alleges that its tax liability for the fiscal year ended June 30, 1917, and its tax liability for the six-month period ended December 31, 1917, are in controversy, as well as its tax liability for the years 1918, 1919, 1920, and 1921. However, the deficiency letter shows that the respondent has determined over-assessments for the fiscal year ended June 30, 1917, and the six-month period ended December 31, 1917, which do not arise from the disallowance or partial disallowance of a claim for abatement. We there-

---

[1] Including $188.16 paid to outside engineers.

fore have no jurisdiction to hear and determine this proceeding in so far as it relates to the fiscal year and the six-month period. *Appeal of R. P. Hazzard Co.*, 4 B. T. A. 150; *Appeal of Cornelius Cotton Mills*, 4 B. T. A. 255.

The next question presented is whether the payments made by the petitioner to the Manchester Company in the years 1918, 1919, and 1920, under the circumstances set forth in the findings of fact, were capital expenditures or ordinary and necessary business expenses. We have carefully considered the contract which gave rise to these payments and we are unable to see any reason for considering that they constituted capital expenditures. Capital expenditures result in the acquisition of capital assets, but in this case the contracts specifically provide that the petitioner " shall acquire no ownership in the extension of said buildings on account of the above payments." We are of the opinion that the payments in question constituted ordinary and necessary business expenses of the petitioner which are deductible in computing its net income for the years in which the obligations accrued.

The last question is whether the amount of $1,317.08, paid by the petitioner to the Manchester Company on January 1, 1921, as interest on the payments heretofore mentioned, is deductible in the year 1921 or should be allocated to the years in which the payments were made. The contract between the petitioner and the Manchester Company provided that the several payments should be made on January 1, 1917, January 1, 1918, January 1, 1919, and January 1, 1920, and that interest thereon at the rate of 7 per cent should be paid on January 1, 1921. The contract also provided that if it was terminated by the Manchester Company before the payments, including interest payment, had been made, no further payments would be required from the petitioner. The contract was to run at least three years from January 1, 1917, but either party could terminate the contract on January 1, 1920, by giving one year's notice of its intention so to do. The petitioner was not obligated to pay any interest until four years from the date of the contract, and if the contract was terminated by the Manchester Company before that date, no interest was due from the petitioner. The interest was payable on January 1, 1921, contingent upon the contract not being terminated before that date, and we are of the opinion that under the circumstances it constituted a proper accrual for the year 1921, and that the amount thereof is deductible from the petitioner's income for that year.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*